X FILED ____ RECEIVED
____ ENTERED ____ SERVED ON
COUNSEL/PARTIES OF RECORD

AUG 30 2011

CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY: ____ DEPUTY

DENIS J. McINERNEY
Chief
CHARLES LA BELLA
Deputy Chief
MICHAEL BRESNICK
Assistant Chief
NICOLE SPRINZEN
MARY ANN McCARTHY
Trial Attorneys
Fraud Section, Criminal Division
U.S. Department of Justice
1400 New York Avenue, NW
Washington, DC 20530
(202) 598-2240

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA
## -oOo-

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, v. STEVEN WARK, Defendant. | CASE NO.: 2:11-cr-00297-LDG-PAL<br>DATE FILED: August 16, 2011<br>VIOLATION:<br>18 U.S.C. §1349 (conspiracy to commit mail and wire fraud -- 1 count) |

## INFORMATION

## INTRODUCTION

**THE UNITED STATES CHARGES THAT:**

At all times material to this Information:

1. Pursuant to Nevada law, a homeowner's association (HOA) is a corporation that governs a common interest community. A HOA is originally controlled by the developer until the housing units are sold, at which time the control is transferred to the bonafide homeowners. Only bonafide homeowners can be members in the HOA.

2. A HOA is governed by a board of directors with a minimum of three members, all of whom must be bonafide homeowners. The board members are elected by the bonafide homeowners annually.

3. Under Nevada law, HOA board members are fiduciaries. As fiduciaries, they are required–among other duties–to act on an informed basis, in good faith and in the honest belief that their actions are in the best interest of the association. Any person nominated for the board must make a good faith effort to disclose any financial, business, professional, or personal relationship or interest that would result or would appear to a reasonable person to result in a potential conflict of interest.

4. Consistent with their fiduciary duties and pursuant to Nevada law, HOA board members may not solicit or accept any form of compensation, gratuity, or other remuneration that would improperly influence or reasonably appear to influence the board member's decisions or would result or reasonably appear to result in a conflict of interest.

5. Consistent with their fiduciary duties, the board of directors is empowered to make decisions related to the common interests of the homeowners, including but not limited to: adopting and amending bylaws and budgets, hiring managers, employees, agents, attorneys, independent contractors, instituting or defending the community in litigation, and causing additional improvements or maintenance repairs to be made.

6. Before hiring individuals and companies to work on behalf of the HOA, the HOA board usually obtains three bids for consideration. The three bids are usually presented during public board meetings with an opportunity for the homeowners to comment and discuss the issues at hand. The property manager is usually selected first, and then the property manager helps to identify and obtain bids for other services.

7. Under Nevada law, property managers must earn a Community Association Management (CAM) license before being able to work in the state of Nevada. Property managers have fiduciary obligations to act in the best interest of the community, safeguard financial and

confidential information for the community, and disclose any affiliation or financial interest with any other person or business that furnishes goods or services to the community.

8. Chateau Versailles, a common interest community with 371 units, was located in Las Vegas, Nevada. It had a HOA board consisting of three people.

9. Chateau Nouveau, a common interest community with 564 units, was located in Las Vegas, Nevada. It had a HOA board consisting of seven people.

10. Park Avenue, a common interest community with 642 units, was located in Las Vegas, Nevada. It had a HOA board consisting of five people.

11. Jasmine, a common interest community with 300 units, was located in North Las Vegas, Nevada. It had a HOA board consisting of three people.

12. Vistana, a common interest community with 732 units, was located in Las Vegas, Nevada. It had a HOA board consisting of five people.

13. Sunset Cliffs, a common interest community with 368 units, was located in Las Vegas, Nevada. It had a HOA board consisting of five people.

14. Palmilla, a common interest community with 300 units, was located in North Las Vegas, Nevada. It had a HOA board consisting of three people.

15. Pebble Creek, a common interest community with 196 units, was located in Las Vegas, Nevada. It had a HOA board consisting of three people.

16. Mission Ridge, a common interest community with 384 units, was located in Las Vegas, Nevada. It had a HOA board consisting of five people.

17. Mission Pointe, a common interest community with 248 units, was located in Las Vegas, Nevada. It had a HOA board consisting of three people.

18. Horizons at Seven Hills, a common interest community with 328 units, was located in Las Vegas, Nevada. It had a HOA board consisting of three people.

19. Co-Conspirator A was a construction company incorporated in the state of Nevada. Co-Conspirator A purported to specialize in home building and repairs, including repairs

involving so-called construction defects. Co-Conspirator A was owned and controlled by Co-Conspirator B, a Nevada resident. Co-Conspirator B also owned and controlled other business entities, including a management company (hereinafter "Co-Conspirator E").

20. Co-Conspirator C was a law firm in Las Vegas that specialized in construction defect litigation. Co-Conspirator D was a Nevada attorney who owned and controlled Co-Conspirator C.

**COUNT ONE**

**THE CONSPIRACY**

21. From in or about August 2003 through in or about February 2009, in the District of Nevada and elsewhere, Defendant

**STEVEN WARK,**

with others known and unknown to the United States did knowingly and intentionally conspire, combine, confederate and agree to commit certain offenses against the United States, that is:

a. to devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises; and for the purpose of executing such scheme and artifice, Defendant and his co-conspirators did knowingly place or caused to be placed in a post office and authorized depository for mail matter a thing to be sent and delivered by the U.S. Postal Service or any private or commercial interstate carrier, in violation of Title 18, United States Code, Section 1341; and,

b. to devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises; and for the purpose of executing such scheme and artifice, Defendant and his co-conspirators did knowingly transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343.

## OBJECTS OF THE CONSPIRACY

22. The objects of the conspiracy, which Defendant STEVEN WARK joined in or around May 2005, were for the co-conspirators to:

a. designate and facilitate the placement of straw purchasers in certain common interest communities identified above;

b. facilitate the purchase of units in certain common interest communities identified above by straw purchasers acting on behalf of the beneficial owners of the unit;

c. manipulate the elections of board candidates designated by the co-conspirators and to thereby gain and maintain control of HOA boards and candidates designated by the co-conspirators;

d. manipulate the conduct of HOA business including, but not limited to, the appointment of designated property managers, the hiring of designated lawyers and law firms, and the hiring of designated contractors; and,

e. unlawfully enrich the co-conspirators at the expense of the HOA and bonafide homeowners.

## MANNER AND MEANS

23. In order to achieve the objects of the conspiracy, Defendant STEVEN WARK and others known and unknown to the United States, used the following manner and means, among others:

a. Co-conspirators enlisted several individuals as straw purchasers to use their own name and credit to purchase mortgage loans for units within the HOA communities on behalf of the beneficial owners. These units were often identified by licensed realtors in the state of Nevada, acting on behalf of the co-conspirators. The straw nominees then purchased the properties while concealing the identity and financial interest of the true beneficial owners of the properties from banks, mortgage companies, HOAs, and bonafide homeowners.

b. Co-Conspirator B also used his business entities as straw purchasers to

purchase mortgage loans for units within the HOA communities. Co-Conspirator B and others caused Defendant WARK to become a principal and managing partner of Co-Conspirator E for the sole purpose of purchasing a unit in the name of Co-Conspirator E and allowing Defendant WARK, as a principal, to appear to have an ownership interest at Vistana. Defendant WARK did not have any real interest in Co-Conspirator E. Since Defendant WARK was not a bonafide owner, at the request of the co-conspirators, he agreed to allow 99 percent of the unit he purportedly claimed to own at Vistana to be transferred to another person. Co-conspirators often transferred a partial interest in a unit to another co-conspirator to make it appear as if the co-conspirator was a bonafide homeowner. In this case, however, the business entity, controlled by the co-conspirators, sold the unit to another co-conspirator and the new straw purchaser transferred a one percent interest in the unit back to Defendant WARK.

c. In order to obtain loans to finance these purchases, the straw purchasers falsely stated to mortgage lenders: (i) they were to be the true owners of the properties, (ii) they had made the down payment, (iii) they would make the monthly mortgage payments; and, (iv) they intended to live in the properties. However, the straw purchasers, including Defendant WARK, knew the beneficial owners had often made the down payments and promised to make the monthly mortgage payments for these properties so that there would be little or no cost to the straw purchasers. Many times the straw purchasers represented that the properties were to be "owner occupied" when in fact they were not.

d. Once the straw purchases were complete, the beneficial owners and co-conspirators found tenants to rent the units. The beneficial owners received the rental payments and continued to pay the mortgages and various expenses associated with the straw purchase.

e. Co-conspirators were hired by Co-Conspirator B and others to manage and operate the payments associated with maintaining these straw properties. The co-conspirators called this business of funding these properties the "Bill Pay Program". The co-conspirators involved in running the Bill Pay Program created several limited liability companies, at the

direction of Co-Conspirator B, for the purpose of opening bank accounts and concealing the Bill Pay Program funds. Many of the payments on these properties were wired or caused to be wired from California to Nevada.

f. Defendant WARK, the straw purchasers, and those who acquired a transferred interest in the properties agreed with co-conspirators to run for election to the respective HOA boards. Defendant WARK used the one percent remaining interest in the unit at Vistana to become a HOA board member. Defendant WARK and others concealed the nature of their relationship with the co-conspirators from the bonafide homeowners and the HOA.

g. To ensure Defendant WARK and the co-conspirators would win the election, co-conspirators employed deceitful tactics, such as creating false phone surveys to gather information about homeowners' voting intentions, using mailing lists to vote on behalf of out-of-town homeowners unlikely to participate in the elections, and submitting fake and forged ballots. Co-conspirators also hired private investigators to find "dirt" on the bonafide candidates in order to create smear campaigns.

h. Knowing that certain straw purchasers did not have a real beneficial interest in the community and were being nominated and elected to further the objects of the conspiracy, Defendant WARK agreed and served as Co-Conspirator B's campaign consultant to help the straw purchasers get elected to HOA boards.

i. Another tactic co-conspirators used to rig certain HOA board elections was to prepare forged ballots for out-of-town homeowners and cause them to be either transported or mailed to California and thereafter to have the ballots mailed back to Las Vegas from various locations around California so as to make it appear that the ballots were completed and mailed by bonafide homeowners residing outside Nevada.

j. On several occasions, co-conspirators attempted to create the appearance that the elections were legitimate by hiring "independent" attorneys to run the HOA board elections. The homeowners were led to believe that these "special election masters" would collect and secure

the ballots and preside over the HOA board election, including supervising the counting of ballots, to ensure no tampering occurred. However, the special election masters were paid or promised cash, checks, or things of value for their assistance in rigging the elections. They allowed the co-conspirators to access the ballots for the purpose of opening the ballots and pre-counting the votes entered for each candidate to then know the number of fake ballots which needed to be created to ensure the co-conspirator up for election won the seat on the HOA board.

k. Once Defendant WARK, the straw purchasers, and those other co-conspirators who acquired a transferred interest in the properties were elected to the HOA boards, the co-conspirators paid or promised cash, check, or things of value for their participation, all of which resulted in a personal financial benefit to the co-conspirators, including Co-Conspirators A, B, C, and D.

l. The co-conspirator board members would meet with the other co-conspirators in order to manipulate board votes, including those votes relating to the selection of property managers, contractors, and general counsel, and attorneys to represent the HOA. These co-conspirator property managers and general counsel would then recommend that the HOA board hire Co-Conspirators A and B for remediation and construction defect repairs and Co-Conspirators C and D to handle the construction defect litigation.

m. Often the co-conspirators created and submitted fake bids for "competitors" to make the process appear to be legitimate while ensuring co-conspirators were awarded the contract. In addition, Co-Conspirator A's initial contract for emergency remediation repairs contained a "right of first refusal" clause to ensure Co-Conspirator A was awarded the construction repair contracts following the construction defect litigation.

n. This process created the appearance of legitimacy since bonafide homeowners believed the elected board members, property managers, and general counsel were, as fiduciaries, acting in their best interest rather than to advance the financial interests of co-conspirators. In fact, Defendant WARK and others were paid by or on behalf of their co-conspirators, including Co-

Conspirators A and B, for their assistance in purchasing the properties, obtaining HOA membership status, rigging elections, and manipulating their votes to further the goals of the conspiracy and to enrich the co-conspirators at the expense of the HOA and bonafide homeowners.

All in violation of Title 18, United States Code, Section 1349.

**NOTICE OF FORFEITURE**

1. As a result of the violations of Title 18, United States Code, Sections 1341 and 1343, set forth in this information, Defendant

**STEVEN WARK**

shall forfeit to the United States of America any property, real or personal, that constitutes or is derived from proceeds traceable to the commission of such offenses, as charged in this information, including, but not limited to, the amount of the unlawfully obtained financing for the unit at Vistana that was purchased on behalf of Defendant WARK as principal of Co-Conspirator E on or about October 25, 2005, and the amount of any salary, payment, or thing of value he received in connection with the conspiracy to commit mail and wire fraud.

2. If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the Court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property subject to forfeiture.

All pursuant to Title 18, United States Code, Section 982(a)(2).

DENIS J. McINERNEY
Chief
Criminal Division, Fraud Section

CHARLES LA BELLA
Deputy Chief

MICHAEL BRESNICK
Assistant Chief

NICOLE SPRINZEN
Trial Attorney

MARY ANN McCARTHY
Trial Attorney